# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### July 2000 Session

## STATE OF TENNESSEE v. JAMES M. McBRIDE

**Appeal from the Criminal Court for Roane County**
**No. 11932      E. Eugene Eblen, Judge**

---

**No. E2000-00096-CCA-R3-CD**
**September 26, 2000**

---

The defendant appeals his convictions for two counts of first degree murder and one count of attempted first degree murder. He contends that the evidence is insufficient to show premeditation, that his confession should have been suppressed, that the trial court erred in admitting gory photographs of the victims and of the motor vehicle, and that the trial court erred in sentencing him to consecutive sentences. We affirm the convictions and the sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

John M. McFarland and Charles B. Hill, II, Kingston, Tennessee, attorneys for the appellant, James M. McBride.

Paul G. Summers, Attorney General and Reporter; R. Stephen Jobe, Assistant Attorney General; J. Scott McCluen, District Attorney General; and Daryl Roger Delp, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, James M. McBride, appeals as of right his convictions by a jury for two counts of first degree murder and one count of attempted first degree murder. The jury sentenced the defendant to life imprisonment on each count of first degree murder. At the sentencing hearing, the trial court sentenced the defendant to twenty years for the attempted first degree murder conviction. The trial court determined that the life sentences would run concurrently but that the twenty-year sentence would run consecutively. The trial court based its decision to impose consecutive sentences on the finding that the defendant was a dangerous offender. On appeal, the defendant contends (1) that the evidence is insufficient to show premeditation; (2) that his confession should have been suppressed because he did not voluntarily, knowingly, and intelligently waive his

constitutional rights; (3) that the trial court erred in admitting gory photographs of the victims and of the motor vehicle; and (4) that the trial court erred in sentencing him to consecutive sentences.

At trial, the surviving victim, Nelson Harmon, testified as follows: The evening of April 1, 1998, John Ruland, Elizabeth Ray, and he went in Ray's car to Michael Roddy's house to see if Roddy, who is the defendant's uncle, was interested in buying Harmon's car. Roddy said that he was interested in the car. At that point, Ruland, Ray, and he left and returned with the car shortly before midnight. He parked his car and went over to Ray's car to talk with Roddy about the title to his car. He was sitting in the back seat on the driver's side with the door open, and Roddy was standing outside the car. Ruland was sitting in the front passenger seat.

While talking to Roddy, Harmon saw the defendant for the first time. The defendant was approaching the car carrying something on his side. He heard Roddy say something like, "Jamie don't. Go in the house. This doesn't concern you." As the defendant approached Ray, Harmon heard Ray, who was standing about eight feet in front of the car, say something like, "Jamie leave us alone. We haven't done anything to you." Harmon saw the defendant, without speaking, lift a shotgun, put it to Ray's head, and shoot her in the eye. When he saw this, he tried to slide down in the back seat and get out the passenger side. That door was locked, and he was unable to escape before the defendant reached the car. The defendant ran to the driver's side of the car and entered the car through the opened front door. He shot Ruland twice – once in the upper body and once in the head. The defendant then shot Harmon twice. Although the defendant was pointing the gun at Harmon's head, Harmon was able to direct the barrel of the gun down, causing the first shot to hit his leg and the second to hit his arm and side. The defendant continued to pump the shotgun and pull the trigger, but the gun was out of ammunition. When the shooting stopped, Harmon was able to open the passenger side door and get out of the car. Then, the defendant ran to that side of the car and struck him twice in the head with the stock of the shotgun, yelling for him to die. When Harmon fled, the defendant did not chase him. Later, when Harmon was in an ambulance, someone asked him who had done the shooting. He told them that Jamie had done it.

Chuck Moore, a detective with the Harriman Police Department, testified at trial as follows: He arrived at the scene shortly after midnight on the morning of April 2, 1998. He asked Harmon who had shot these people, and Harmon answered that Jamie McBride had shot them. Shortly thereafter, Moore ordered everyone to come out of Roddy's house with their hands behind their heads. Four people came out: the defendant, wearing only undershorts; Roddy; Gordon Gillespie, another uncle of the defendant; and Marilyn Bazler. He asked each of them their names, and when he discovered the defendant's name, he took the defendant into custody.

The defendant did not appear intoxicated to Moore, nor did Moore smell any alcohol on the defendant's breath, although the defendant told him that he had been drinking. Also, the defendant was very steady on his feet and did not have any trouble walking down the steps, even with his hands behind his head and his fingers interlocked. The defendant followed all directions, and the defendant promptly and clearly responded to his questions.

Moore said that beginning at 5:50 a.m., he and Randy Scarborough, an investigator for the Roane County Sheriff's Department, interviewed the defendant in Scarborough's office at the Roane County Jail. He read the defendant the <u>Miranda</u> warnings, and the defendant said that he understood his rights. The defendant signed a waiver at 5:57 a.m. The defendant confessed to the crimes during the questioning that followed, which they recorded. The tape was played during Moore's testimony, and it revealed in relevant part:

> [Roddy and I were] drinking and then some people pulled up . . . and he said "man yeah there they go, they owe me some money." O.K., so they went in there an had some words, he said Jamie . . . they probably gonna try and jump me, go get the gun, go get the gun. So I went in there and got the gun. . . . [H]e told me to get the gun and then he said their gonna get me, they gonna jump me, so I'm loving my uncle like that and don't want nothing to happen to him, it's just a drug deal anyway, I'm thinkin their gonna shoot him, but then I started shootin without even thinkin and that's what happened. I ran from the car to the back and put the gun in the bushes in the back and went into the house when you all came. . . . I put the jacket around the gun.
> . . . .
>
> It was already loaded. I didn't even have to cock it, just take the safety off of it. . . . I ain't never seen that gun until that day.
> . . . .
>
> I was just shootin. I wasn't trying to, I was trying to hit below, I was trying to hit at their knees, but the gun was so powerful I couldn't do nothing with it.

Moore said that the defendant did not appear intoxicated during questioning and that his responses were clear and not out of the ordinary.

Chris Mynatt, a Harriman police officer, testified at trial that he found a twelve-gauge, pistol-grip shotgun behind Roddy's house under a coat in some bushes. He also stated that the defendant did not appear drunk, did not smell of alcohol, did not stagger or have difficulty walking, and did not have difficulty responding to commands.

Michael Roddy, the defendant's uncle, testified at trial as follows: He owned a twelve-gauge, pistol-grip shotgun identical to the one found behind his house, and he kept this shotgun loaded and behind a chair in his living room. Roddy said that on the evening of April 1, 1998, Ruland, Ray, and Harmon, none of whom owed him any money, came over to his house and asked him if he was interested in buying Harmon's car. He said that he was interested, but he wanted to see it. Ruland, Ray, and Harmon left to get Harmon's car. When Ruland, Ray, and Harmon returned, he went outside to see the title and talk about the price. When he went back inside to see if he had enough money to buy the car, the defendant thought there was some kind of conflict. He told the defendant that it was cool and that there was no problem. At some point, the defendant got the shotgun and

-3-

went outside. He never told the defendant that he needed help, and he never asked the defendant to get a weapon. He told the defendant to put away the shotgun and unsuccessfully tried to take it from him. He heard the defendant arguing outside with the victims. Roddy stated that when he went outside, he heard shots and immediately dropped to the ground. He saw the defendant come back down the street and go behind the house. The defendant then returned to the house, told the others not to say anything, undressed, and got into bed.

Roddy said that the defendant had started drinking around 8:00 a.m. on April 1, 1998. Between this time and the time of the shootings, the defendant consumed more than twelve beers, smoked marijuana, and snorted cocaine.

Gordon Gillespie, another uncle of the defendant, testified as follows: He lives next door to Roddy, and he saw the defendant on and off all day. The defendant was intoxicated the evening of April 1, 1998. The defendant drank a lot of beer, smoked marijuana, and snorted cocaine.

Gillespie was in his front yard the first time that Ruland, Ray, and Harmon came to see Roddy, and he heard them arguing. After Ruland, Ray, and Harmon left, he went over to Roddy's house. He heard Roddy tell the defendant that he almost got in a fight with someone about a car. When Ruland, Ray, and Harmon returned with Harmon's car, Roddy went outside to talk to them. He could hear what sounded like an argument. At this point, the defendant asked him if the people outside were the same ones with whom Roddy had previously argued, and he said, "Yes." The defendant got dressed and took the shotgun. Gillespie said that he asked him why he had the gun, and the defendant said that they had "disrespected" his uncle and that he was going to scare them. Both Roddy, who had returned to the house, and he told the defendant not to take the gun outside. Roddy and the defendant went outside, and he heard them arguing. When Roddy came back inside the house, Gillespie heard the defendant arguing with the victims, and then he heard the gunfire. He looked outside a window and saw the defendant run through the yard and behind the house. When the defendant came back inside, the defendant said that he had not done anything. Roddy said something like you just killed those folks, and the defendant said that he had not done anything and just to go to bed and not to answer the door. The defendant also told them to tell the police that they were all asleep.

## I. SUFFICIENCY OF THE EVIDENCE

On appeal, the defendant contends that the evidence is insufficient to show premeditation on his part. The defendant asserts that he went outside with the shotgun only to scare the victims and that an argument with the victims provoked him to shoot them. The state contends that the evidence is sufficient.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the

evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

First degree premeditated murder is defined as a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Further, "premeditation" is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has delineated the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id.

Applying the above factors, the record in this case reveals sufficient evidence of premeditation to support the defendant's convictions of first degree murder and attempted first degree murder. Viewing the evidence in the light most favorable to the state, the proof shows that Ruland, Ray, and Harmon were trying to sell a car to Roddy. There was never an argument between these parties. However, the defendant, perhaps believing that the victims had shown no respect to Roddy, obtained a twelve-gauge, pistol-grip pump shotgun from Roddy's house and went outside to confront the unarmed victims. Both Roddy and Gillespie told the defendant not to go outside with the gun, and Roddy even tried to take the gun from the defendant. Despite these attempts to stop the defendant, the defendant walked outside, took the safety off the gun, and approached Ray. The defendant, without hesitating or speaking, put the shotgun to Ray's head and shot her in the eye. The defendant then ran to the nearby car and shot Ruland once in the back and once in the head. The defendant turned the gun on Harmon, but Harmon was able to direct the gun away from his head, resulting in the defendant shooting him once in the leg and once in the arm and side. The defendant continued to pump the shotgun and pull the trigger, but the gun was out of ammunition. Harmon was able to escape from the car, but the defendant ran around the car and hit Harmon in the head with the now empty shotgun, shouting for him to die. The defendant ran from the car to the back of Roddy's house and hid the shotgun in a jacket under some brush. The defendant then went inside Roddy's house and instructed his uncles that he did not do anything, to go to bed, and not to answer the door. The defendant then stripped down to his undershorts and got into bed.

We conclude that most, if not all, of the factors listed in Bland are present. The defendant obtained a weapon and refused his uncles' pleas to put it down. He shot three unarmed victims from close range, aiming at each victim's head. When the third victim did not die immediately, he hit him in the head with the shotgun, shouting for him to die. Finally, after the shootings, the defendant calmly attempted to conceal his crime by hiding the gun, instructing his relatives to cover up his actions, and undressing and getting into bed to act as if he had been asleep. Because a rational jury could have found premeditation beyond a reasonable doubt based on these reasonable inferences, the evidence is sufficient to support the defendant's convictions of first degree murder and attempted first degree murder.

## II. SUPPRESSION OF DEFENDANT'S STATEMENT

The defendant contends that the trial court erred in denying his motion to suppress his statement given to the police on the morning after the shootings. The defendant contends that because of his intoxicated state, he was unable to make a voluntary, knowing, and intelligent waiver of his constitutional rights under Article I, Section 9 of the Tennessee Constitution and under the Fifth Amendment of the United States Constitution. For a waiver of these rights to be valid, the waiver must be made voluntarily, knowingly, and intelligently, Miranda v. Arizona, 384 U.S. 436, 475, 86 S. Ct. 1602, 1628 (1966), which, in turn, is determined by the "totality of the circumstances surrounding the interrogation." State v. Van Tran, 864 S.W.2d 465, 472-73 (Tenn. 1993) (citing North Carolina v. Butler, 441 U.S. 369, 374-75, 99 S. Ct. 1755, 1758 (1979)).

A trial court's decision on a motion to suppress will be upheld unless the evidence in the record preponderates against it. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Further, questions of the "credibility of witnesses, the weight and value of the evidence, and the resolution of conflicts in the evidence are matters entrusted to the trial judge as a trier of fact." Id. The prevailing party "is entitled to the strongest view of the evidence, as well as all reasonable and legitimate inferences that may be drawn from the evidence." Id. Finally, both the proof adduced at the suppression hearing and the proof adduced at trial may be considered in reviewing the trial court's decision on the motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

At the suppression hearing, the trial court heard the testimony of four witnesses: the defendant, Michael Roddy, Chuck Moore, and Randy Scarborough. The testimony of the witnesses were markedly different.

The defendant testified that on April 1, 1998, between 8:00 a.m. and 11:50 p.m., he drank more than twelve beers, some whiskey, and three glasses of champagne. The defendant also stated that he smoked about an ounce of marijuana and snorted about a gram of cocaine. The defendant testified that he was drunk and high at the time he gave his statement and that he did not understand what he was doing when he waived his Miranda rights.

The defendant's testimony was corroborated by Michael Roddy, the defendant's uncle. Roddy testified at the suppression hearing that he saw the defendant drinking, smoking marijuana,

and snorting cocaine all day on the date of the shootings. Roddy, of course, was not present at the jail when the defendant signed the waiver nearly six hours after his arrest.

The two officers that questioned the defendant concluded that the defendant was not intoxicated. Detective Moore testified at the suppression hearing that the defendant did not appear intoxicated at the crime scene or at the jail when he waived his <u>Miranda</u> rights and gave his statement. He stated that the defendant's speech was rational and plain, not slurred or difficult to understand. Further, he said that the defendant never staggered and that the defendant was able to understand and follow instructions. On cross-examination, he admitted that the defendant told him several times during the questioning that he had been drinking a lot the previous day.

Roane County Sheriff's Investigator Randy Scarborough testified that Detective Moore and he questioned the defendant beginning around 5:50 a.m. on April 1, 1998, in his office at the Sheriff's Department. He stated that the defendant was read and waived his <u>Miranda</u> rights and that the defendant confessed to the crimes during the subsequent questioning. He testified that the defendant did not appear to be drunk and did not have trouble understanding questions or communicating. On cross-examination, he admitted that the defendant told him several times during the questioning that he had been drinking the previous day and that he was drunk at the time of the shootings.

The trial court accredited the testimony of the police officers and denied the defendant's motion to suppress, specifically finding that the defendant's statements were made voluntarily and intelligently after the <u>Miranda</u> warnings were waived. The trial court's findings are presumed correct and may only be overcome on appeal if the evidence in the record preponderates against the trial court's findings. From the record before us, the evidence does not preponderate against the trial court's finding that the defendant's <u>Miranda</u> waiver and subsequent statement to the police were intelligently and voluntarily made.

### III.  ADMISSIBILITY OF PHOTOGRAPHS

The defendant contends that the trial court erred in admitting gory photographs of the victims and of the motor vehicle. The defendant argues that some of the photographs admitted into evidence were not used for the purposes of proving any part of the state's case. Further, the defendant argues that the unfair prejudice produced by the gruesome nature of the photographs substantially outweighed their probative value.

The leading case regarding the admissibility of photographs of murder victims is <u>State v. Banks</u>, 564 S.W.2d 947 (Tenn.1978), in which the supreme court indicated that the admissibility of photographs of murder victims is within the discretion of the trial court after considering the relevance, probative value, and potential unfair prejudicial effect of such evidence. Generally, "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." <u>Id.</u> at 950-51. However, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to

inflame the jury and prejudice them against the defendant." Id. at 951. The determination of the admissibility of photographs lies within the sound discretion of the trial court, and that discretion will not be overturned on appeal absent a clear showing of abuse. State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992) (citing State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985)). In a homicide trial, a photograph of the victim or of the crime scene is admissible only if (1) the photograph is relevant to prove some part of the state's case and (2) the photograph's probative value is not substantially outweighed by the unfair prejudice to the defendant. Id.; see also Tenn. R. Evid. 403. Here, the defendant attacks both of these prongs.

At the trial, the state introduced seventeen photographs of the crime scene. In his brief, the defendant does not specify the photographs to which he objects. Rather, the defendant asserts generally that the photographs of the victims and the motor vehicle should not have been admitted. Of the color photographs admitted at trial, five showed the inside of the blood-and-flesh-splattered car and three showed the victims. Two of the three photographs of the victims could be considered gruesome. One photograph was of the full body of Ray on the ground with a pool of blood next to her head. Another photograph was a close-up of Ruland's bloody head. The third photograph of Ruland's back is not gruesome.

The state argues that the photographs of the victims are relevant to show premeditation. Photographs may be relevant to the issue of premeditation. See Banks 564 S.W.2d at 949-50. However, "in some cases, photographic evidence has been excluded because it does not add anything to the testimonial descriptions of the injuries." Id. at 951 (citations omitted). Often, testimony of the witnesses gives an accurate description of the nature and extent of the wounds inflicted on the victims. Id. at 952. As a general rule, when testimony adequately describes the degree or extent of an injury, gruesome and graphic photographs should not be admitted. See State v. Duncan, 698 S.W.2d 63, 69 (Tenn.1985). In the present case, Harmon and Moore testified about the nature and extent of the victims' injuries. Further, the defendant did not dispute that the victims were shot in the head or that those shots caused the victims' death. The photographs of the victims did not add anything to the testimonial descriptions. Thus, the photographs of the victims that were admitted were cumulative evidence, making their probative value minimal. Accordingly, the danger of the unfair prejudice created by bloody, color photographs of the victims substantially outweighed their probative value. The trial court should not have admitted the photographs of the victims.

The second set of photographs, the five pictures of the inside of the car splattered with blood and flesh, is also contested on appeal. The trial court admitted these photographs, finding that they were not prejudicial in any way. The state did not provide a reason at trial why the photographs of the inside of the car were relevant, other than the general assertion that they showed premeditation. It should also be noted that the state does not address these photographs in its brief. However, when the state introduced the photographs, it merely used them to show the crime scene. The state never explained, and it is not apparent, how these photographs are relevant to show premeditation. Further, Moore could have just as easily described the inside of the car without the use of the close-up, color photographs. If gruesome photographs of the crime scene are not relevant to prove the state's case,

then they should be excluded. Here, the trial court should have excluded the photographs of the inside of the car.

Although the photographs of the victims and of the car should have been excluded, the error is harmless. "In Tennessee, nonconstitutional errors will not result in reversal unless the error affirmatively appears to have affected the result of the trial on the merits, or considering the whole record, the error involves a substantial right which more probably than not affected the judgment or would result in prejudice to the judicial process." State v. Harris, 989 S.W.2d 307, 315 (Tenn. 1999) (citing Tenn. R. Crim. P. 52(a) and Tenn. R. App. P. 36(b)).

In this case, it cannot be said that the error more probably than not affected the judgment. Although the photographs are gruesome, the result of the trial would have been the same if the photographs had been excluded. All of the elements of the offenses were established through other evidence. Moreover, descriptions of the victims' injuries were provided through witnesses. With the defendant's guilt being overwhelming, the admission of the photographs did not more probably than not affect the judgment. Therefore, the admission of the photographs of the victims and of the car was harmless.

## IV. CONSECUTIVE SENTENCES

The trial court sentenced the defendant to serve the two life sentences concurrently; however, it sentenced the defendant to serve the twenty-year attempted first degree murder sentence consecutively. The defendant contends that the trial court erred in finding him to be a dangerous offender and, consequently, imposing consecutive sentences. He complains that the trial court did not consider the defendant's background or alleged intoxication at the time of the crime.

When a defendant appeals the manner of service of a sentence imposed by the trial court, this court conducts a de novo review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appealing party. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments. However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the sentence is purely de novo. Ashby, 823 S.W.2d at 169.

Consecutive sentencing is guided by Tenn. Code Ann. § 40-35-115(b), which states in pertinent part:

> The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:
> . . . .

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high.

For dangerous offenders, though, "consecutive sentences cannot be imposed unless the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995); State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). The trial court is required to recite the specific findings of fact behind its imposition of a consecutive sentence. See Tenn. Code Ann. § 40-35-209(c); Ashby, 823 S.W.2d at 169.

In the present case, the trial court imposed consecutive sentences because it found that the defendant was a dangerous offender. The trial court based its finding on the presence of multiple victims and the manner in which murder was attempted, specifically the defendant's behavior after the two shots did not kill Mr. Harmon. The defendant's contention that the trial court failed to consider his intoxication or his background is without merit. Both of these arguments were presented by the defendant and considered by the trial court during the sentencing hearing. Ample evidence supports the trial court's finding that the defendant's behavior indicated little or no regard for human life and that the defendant had no hesitation about committing a crime in which the risk to human life is high.

However, the trial court failed to address the Wilkerson factors, which removes the presumption of correctness for the consecutive sentencing determination. Thus, we must determine if these factors are present through a de novo review of the record. First, the effective sentence of life plus twenty years does reasonably relate to the severity of the defendant's offenses. The defendant brutally killed two people by shooting them in their heads. Further, the defendant shot a third victim twice and continued to pump the shotgun and pull the trigger when the gun was out of ammunition. Finally, when the third victim did not die, the defendant beat him with the shotgun, telling him to die. These are severe offenses, and the consecutive sentence reasonably relates to their severity.

Second, we must determine whether consecutive sentencing is necessary to protect the public from future criminal conduct by the defendant. This rationale for consecutive sentencing was first stated by our supreme court in Gray v. State. 538 S.W.2d 391, 393 (Tenn. 1976). It was codified in the Criminal Sentencing Reform Act of 1989, Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments, and was reiterated in Wilkerson, 905 S.W.2d at 938. Gray established that a dangerous offender should not be sentenced to consecutive sentences based only upon the fact that two or more dangerous crimes were committed, but consecutive sentences should be "based upon the presence of aggravating circumstances." Gray, 538 S.W.2d at 393. Here, as discussed above, several aggravating circumstances exist. Again, the defendant brutally killed two unarmed people by shooting them in their heads. The defendant attempted to kill a third unarmed victim by shooting him in the head, but this victim was able to direct the gun away from his head. The defendant continued to pump the shotgun and pull the trigger, attempting to kill the third victim. When the defendant realized the gun was out of ammunition, he beat the victim with the gun, shouting for him

to die. The public needs and deserves protection from this type of criminal behavior, of which this defendant has shown he is capable. Therefore, with both of the Wilkerson factors present, we affirm the trial court's imposition of consecutive sentences.

## V. CONCLUSION

In consideration of the foregoing and the record as a whole, we affirm the defendant's convictions and sentence.

_____

JOSEPH M. TIPTON, JUDGE